NEWHOUSE, Appellee,

v.

WILLIAMS, Appellant.

[Cite as *Newhouse v. Williams*, 167 Ohio App.3d 215, 2006-Ohio-3075.]

Court of Appeals of Ohio,
Third District, Wyandot County.

No. 16–05–22.

Decided June 19, 2006.

James Ruhlen, for appellee.

Kevin P. Collins, for appellant.

---

Bryant, Presiding Judge.

{¶ 1} Respondent-appellant Shawn Williams brings this appeal from the judgment of the Court of Common Pleas of Wyandot County granting a civil protection order ("CPO") to petitioner-appellee Anita Newhouse.

{¶ 2} In 1996, Newhouse and Williams were divorced. The parties have one son, Lakota, from the marriage. Lakota was born on January 9, 1991. Lakota resides with Newhouse and Williams was granted visitation in Newhouse's home under the supervision of Newhouse. In July 2005, Williams called Newhouse's coworker and friend,[1] Steve, to ask him to help convince Newhouse to relax the restrictions on visitation. Williams was given the phone number of the friend by Lakota, who obtained the number from his mother's cell phone. On July 19, 2005, Williams called Steve around 10:30 pm. Steve, who was with Newhouse when the call was received, permitted Newhouse to listen to the phone call but did not tell Williams that Newhouse was present and listening. Newhouse was upset that Williams had called Steve and went home to confront Lakota about the phone call. Lakota admitted giving the phone number to Williams, and an argument followed between Newhouse and Lakota.

{¶ 3} During the dispute, Newhouse called Williams and confronted him about the call to Steve. The parties argued, and Newhouse threatened to prevent Williams from ever seeing Lakota again. Williams then told Newhouse that he would be filing a motion to modify custody the next day and would let the court handle the matter. The parties continued arguing until Newhouse hung up on Williams. Williams called Newhouse back and asked if something could be worked out. Newhouse responded that she would not work anything out and that they were going to go back to court over visitation. Williams then

---

1. Although the type of relationship is never specified, the record clearly indicates that Williams and Lakota believed the relationship between Newhouse and Steve to be of a romantic nature despite the fact that Steve is married to someone else.

responded that things "could get really, really bad for everybody involved." Newhouse hung up on Williams again.

{¶ 4} Subsequent to the third phone call, Newhouse and Lakota got into a "confrontation." Newhouse demanded that Lakota surrender his cell phone and have no contact with his father until after the court hearing. Newhouse testified that Lakota then "kind of got out of control" and she called the police. She told the officers that Lakota was out of control and he should be taken away. The police refused to do so, but agreed to file an unruliness complaint with the juvenile court.

{¶ 5} While the police were there, Williams called Newhouse. Newhouse put the call on speakerphone and attempted to ask why he had called Steve. Lakota told Williams that the police were in the room listening. Williams told Lakota to respect his mother and listen to her. Williams and Newhouse got into an argument when Newhouse told him that the police were there to take Lakota away. Newhouse told Williams that he should get a good lawyer because she was taking him to court for threatening her and Steve. Newhouse terminated the call.

{¶ 6} Williams called Newhouse again. She told him not to call again and handed the phone to the police. The police advised Williams that if he called again, charges of telecommunication harassment could be filed. Williams then hung up. Newhouse asked the officers for the procedures for obtaining a CPO, which the officers gave to her.

{¶ 7} On July 20, 2005, Newhouse filed a petition for a CPO against Williams on behalf of herself and Lakota. The alleged acts of domestic violence were as follows:

> Influenced minor son to call 911 & children services against mother—wants custody & mother to pay him child support, is very argumentative and aggressive to mother & threatened physical harm stated in 7/20/2005 police report after 911 call from mother.

A copy of the police report was attached, which stated that Newhouse had told the officer that Williams had threatened her by stating that things would get bad for her and that she took this statement as a threat due to his violent behavior in the past. An emergency CPO was granted and a hearing was set for July 27, 2005. At the hearing, Williams appeared without counsel. At the conclusion of the hearing, the magistrate granted a five-year CPO and ordered that Williams not possess any deadly weapons. Williams filed objections to the magistrate's decision. On October 6, 2005, the trial court overruled the objections and granted a CPO preventing Williams from having contact with Newhouse and

from possessing any deadly weapons. Williams appeals from this judgment and raises the following assignments of error.

The record contains insufficient evidence to support the civil protection order as to Lakota.

The record contains insufficient evidence to support the civil protection order as to [Newhouse].

[William's] right to due process was violated because he was not given sufficient notice of the nature of the proceedings.

The court erred to the prejudice of [Williams] by ordering that he may not possess, use, carry or obtain any deadly weapon.

This court notes that although the third assignment of error was stated in the brief, no argument was presented by Williams on the issue. An appellate brief must contain an argument for each assignment of error presented for review that refers to the record where the alleged error occurred. App.R. 16(A). Since no argument was made, this court will not address the third assignment of error.

{¶ 8} The first assignment of error addresses the sufficiency of the evidence as it applies to Lakota. The CPO from which Williams appeals does not apply to Lakota. Although the initial petition and the temporary order did apply to Lakota, the trial court's final CPO applies only to Newhouse. Thus, the trial court obviously had already concluded that there was insufficient evidence to support a CPO to protect Lakota as no threats were even alleged to have been made against him. The first assignment of error is overruled.

{¶ 9} In the second assignment of error, Williams claims that the evidence is insufficient to support granting a CPO in favor of Newhouse.

A person may seek relief [from domestic violence] * * * by filing a petition with the court. The petition shall contain or state:

(1) An allegation that the respondent engaged in domestic violence against a family or household member of the respondent, including a description of the nature and extent of the domestic violence;

(2) The relationship of the respondent to the petitioner, and to the victim if other than the petitioner;

(3) A request for relief under this section.

R.C. 3113.31(C). "Domestic violence" is defined as either recklessly causing or attempting to cause bodily injury or placing another person by the threat of force in fear of imminent serious physical harm. R.C. 3113.31(A)(1). The initial application claims that Williams threatened Newhouse and that this was confirmed in the police report. This court notes that the police report contains no confirmation that a threat was actually made. The report only states that Newhouse claims that Williams had threatened her and contains no specifics as to

the nature of the threat. The original call to the police was not made due to the threat, but was made because Newhouse believed her son was out of control and wanted the police to remove him from the home as unruly.

{¶ 10} On July 2, 2005, a hearing was held on the petition for a CPO. At the hearing, Newhouse testified that a call was made to Steve after Lakota gave him the number. She was angry with Lakota for giving the number to Williams. She testified that afterward there were phone calls between her and Williams with her initiating the first call. After Newhouse ended the first call by hanging up on Williams, he called her back. Newhouse testified as to the content of that call as follows.

[H]e said, "Well are you ready to talk to me yet? Are we ready to work something out on this visitation?"

I said, "No." I said, "I'm not working nothing out. I'm not changing anything, we're going back to court over this visitation."

"Well, things could get really, really bad for everybody involved. Things can get really really bad."

This is the alleged threat of imminent physical harm which is the basis of the CPO. Newhouse testified that she took this to be a physical threat based upon his past behavior. According to her testimony, there were alleged instances of domestic violence by Williams against her prior to her divorce. Specifically, Newhouse claims that these events occurred between 1993 and 1996. No testimony was given that any more recent events had occurred even though the two had frequently been in the same location since Newhouse personally "supervised" Williams's visits with Lakota in Newhouse's home. Newhouse also testified that she was upset because on May 10, 2005, Lakota had called the police on Newhouse. The next day, Lakota had packed a suitcase and hidden it in a neighbor's yard. Newhouse testified that she was afraid because Williams could have been a block away and Lakota could run away to live with him. Id.

{¶ 11} After the police arrived in response to the call about Lakota's "unruly behavior," Williams called again and asked Newhouse to work something out. Newhouse testified that she told Williams that "he needed to get a good lawyer, that we would be going to court, that it was against the law to threaten me and other people, that he could not do that." After that call terminated, she requested information on how to obtain a CPO, which the officer gave her. Newhouse said that she was not sure whether she should stay in the house that night. She stated she was afraid because she did not know where Williams was or what he was doing. Finally Newhouse testified as follows.

Q. What—can you state for the Court the reason that you feel that this CPO is necessary at this time to protect you?

A. Because I am not giving [Williams] what he wants. I am not afraid of him. He had—he wanted me to pay for a lawyer, change the visitation order and just have a hearing for my child in between the age of 14 and 15 to have his day in court, a free day in court with me paying for it. I was not willing to do that.

Now, he was trying to threaten me, my friends, uhm, accused me of having, you know, an involvement with someone that's married. You can't go, you know, threatening friends of mine, you know, and their families you know.

Also, and I know what he's capable of. He'll—he'll tamper with your vehicle. Like I said, he'll—he'll cut your screens, come in your home. That's a big threat to anybody in the area, let alone just one friend of mine.

Newhouse's testimony repeatedly states that her fear is that her child will want to leave and go live with his father. Newhouse's testimony was the only testimony given in support of the CPO.

{¶ 12} Testimony was given by Williams and two witnesses opposing the CPO. Williams testified that the only threat he made to Newhouse was that he would file a motion to modify custody, which he did. Williams's first witness overheard Williams's conversation with Steve and testified that no threat was ever made. Williams's second witness was his second wife. She testified that she did not hear Williams make a threat against Newhouse in the conversation she overheard. However, she did hear Newhouse state that Williams had threatened her.

{¶ 13} In order to grant a CPO in this case, the trial court was required to find that Williams threatened Newhouse with imminent serious physical harm and that Newhouse had a reasonable fear because of this threat. The trial court based its findings upon the events alleged by Newhouse as occurring before 1996, and upon the statement made by Mrs. Williams that she overheard Newhouse state that Williams had threatened her. The record contains allegations of a threat by three parties: Newhouse, the police, and Mrs. Williams. However, the only party to actually hear the alleged threat was Newhouse. The other parties were merely reporting what Newhouse stated. Just because she repeatedly stated something does not make it true. Additionally, she is not specific as to the nature of the threat. She claims that he threatened her by stating that things would get "really, really bad for everyone involved." She admits that this statement was made while discussing the modification of custody and a return to court for a modification hearing. She also states that she was mad that Williams had threatened to reveal the alleged relationship between her and Steve to Steve's wife. Then Newhouse claims she is afraid because she did not know where Williams was or what he was doing. However, this fear is nothing but speculation and is not reasonable. Williams resides in a different county than Newhouse and Newhouse had called him at his home originally. No explanation,

reasonable or otherwise, was given as to why Newhouse believed that Williams was anywhere but at his home. While Newhouse speculated that Williams could be down the road from her house on his cell phone, she could just as reasonably speculate that he was at home in bed at 1:00 a.m. Taking the alleged threat in the context of the conversation, as established by Newhouse's testimony, the statement was made in response to Newhouse's statement that they would be going back to court concerning the custody. This is not a threat of imminent serious physical harm, but rather a threat of the use of a legal process designed specifically to handle this type of dispute.

{¶ 14} The trial court specifically relied upon the fact that Williams's wife testified that she overheard Newhouse state that Williams had threatened Newhouse. As addressed above, this is not evidence that a threat of imminent serious physical harm was made. It is merely a restatement of Newhouse's testimony. The statement heard by Mrs. Williams contained no specificity as to the nature of the threat in any way. Thus, it cannot be the basis for a CPO.

{¶ 15} The trial court also stated that it granted the CPO based upon the past events between Newhouse and Williams. Incidents too remote in time with no intervening events to set up a pattern of behavior may not be the basis of a CPO. *Young v. Young*, 2d Dist. No. 2005-CA-19, 2006-Ohio-978, 2006 WL 515522 (holding that events occurring five years ago with no other events were too remote to support a CPO). In addition to the past events, there must be some evidence of current domestic violence, as set forth in the statute. *Solomon v. Solomon*, 157 Ohio App.3d 807, 2004-Ohio-2486, 813 N.E.2d 918. There must be some evidence of a reasonable fear of imminent serious physical harm. Newhouse testified that the alleged violence occurred between 1993 and 1996 while the couple was married. No report of this violence was made to the police and no corroboration was presented by Newhouse. Williams denied the allegations, stating that they never occurred. Additionally, based upon the fact that the court granting the divorce permitted Newhouse to supervise visitation between Lakota and Williams in her home, we presume that no allegations were made to the domestic-relations court that supervised the divorce.[2] No allegation of any violence was made in the nine years following the divorce, despite the fact that Williams and Newhouse had contact at every visitation. Given this testimo-

---

2. It would defy all logic to believe that any domestic-relations court would permit a spouse who had allegedly been the victim of domestic abuse to supervise visitation of the alleged abuser with the minor child in her home without any sort of third party, since this would be a recipe for additional domestic violence. The divorce occurred in 1996 when domestic violence was well understood as a problem by domestic-relations courts and the issues of child visitation in a domestic-violence situation had been managed by supervised visitations in neutral locations.

ny, the evidence does not support the trial court's findings that Newhouse's current fear of imminent serious physical harm was reasonable due to Williams's alleged prior conduct. The only real fear repeatedly expressed by Newhouse was that her son would run away to live with his father. This is not a fear of imminent serious physical harm. Thus, the trial court erred in finding that Newhouse had a reasonable fear of imminent serious physical harm. The second assignment of error is sustained.

{¶ 16} The final assignment of error claims that the trial court erred in prohibiting Williams from possessing or using deadly weapons. R.C. 3113.31(E)(1)(h) permits the trial court to grant relief that it deems fair and equitable. Although the trial court has broad discretion when imposing restrictions pursuant to a CPO, this discretion is not limitless. *Maag v. Maag* (Mar. 28, 2002), 3d Dist. No. 16–01–16, 2002 WL 468585. "[R]estrictions must bear a sufficient nexus to the conduct that the trial court is attempting to prevent." Id. Here, no evidence was presented that Williams had ever used or threatened to use a deadly weapon to harm Newhouse. No evidence was presented that Williams even owned a deadly weapon. Thus, the restriction is not supported by any evidence. The trial court abused its discretion by restricting Williams in this manner. The fourth assignment of error is sustained.

{¶ 17} The judgment of the Court of Common Pleas of Wyandot County is reversed, and the CPO is vacated.

Judgment reversed.

ROGERS and CUPP, JJ., concur.