[Cite as *Clementz-McBeth v. Craft*, 2012-Ohio-985.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## AUGLAIZE COUNTY

MARY J. CLEMENTZ-McBETH,

    PETITIONER-APPELLEE,          CASE NO.  2-11-16

    v.

WILLARD L. CRAFT,               O P I N I O N

    RESPONDENT-APPELLANT.

Appeal from Auglaize County Common Pleas Court
Trial Court No. 2011 DR 0123

Judgment Affirmed

Date of Decision:   March 12, 2012

APPEARANCES:

    *Robert W. Kehoe*  for Appellant

    *Matthew J. Kentner*  for Appellee

**SHAW, P.J.**

{¶1} Respondent-appellant, Willard L. Craft ("Craft"), appeals the July 18, 2011 judgment of the Common Pleas Court of Auglaize County, Ohio, granting the petitioner-appellee, Mary J. Clementz-McBeth ("Clementz"), a domestic violence civil protection order ("CPO") for herself and her husband Robert McBeth ("McBeth").

{¶2} The facts relevant to this appeal are as follows.  On June 20, 2011, Craft was the passenger in a vehicle driving past a house belonging to his ex-wife, Clementz, and her husband, McBeth.  While passing by the Clementz/McBeth home, Craft noticed that his youngest son's car was in front of the house and he decided to stop.  Clementz and Craft had three children together, all adults at the time of this incident.

{¶3} At the Clementz/McBeth home, Craft inquired after his son and was informed by McBeth that his son was not present and the car was just there to be fixed.  McBeth then told Craft to leave and advised him not to return.  According to the testimony of Clementz, Craft often came by looking for their kids, none of whom lived with her, and she had repeatedly asked him not to come looking for them.

{¶4} On the instant occasion, after being asked to leave Craft moved to depart. While exiting, he knocked over a piece of lawn furniture.[1] In response, McBeth yelled, "Don't be trying to break my furniture." (July 18, 2011 Tr. at 9). As Craft continued toward the car he muttered to himself, "'F' you, bastard." (July 18, 2011 Tr. at 9). McBeth asked Craft what he had just said, and Craft repeated himself. McBeth and Craft then engaged in a "struggle"[2] that resulted in Craft pulling out a gun that had been concealed in his pocket.

{¶5} A scream from Craft's driver drew Clementz out of the house. When Clementz came outside she observed that her husband, McBeth, had one hand around Craft's wrist of the hand in which Craft was holding the gun. McBeth's other hand was around Craft's neck. According to Clementz, while Craft was brandishing the gun, Craft yelled, "I have a gun, I can kill you." (July 18, 2011 Tr. at 6).

{¶6} Craft and McBeth then separated. According to Clementz, Craft started for the car, then looked over at Clementz and said again that he had a gun and he could kill her. Afterward, Craft got into the car and left.

{¶7} On July 7, 2011, Clementz filed, pro se, a petition for a domestic violence CPO on behalf of both herself and her husband. The ex parte order was granted and a final hearing was set for July 18, 2011. At the final hearing both

---

[1] It is disputed whether the chair was knocked over accidentally or kicked over on purpose.
[2] "Struggle" is how Clementz characterized the altercation in her testimony.

Clementz and McBeth testified to the foregoing events, though McBeth's only statement was that what his wife had said was true. Craft testified on his own behalf, claiming that he only pulled the gun in self-defense and made no death threats. Craft also stated that he had a witness to the event but said that she could not make it to the hearing. When Craft was finished testifying, the court asked him if he had any other testimony to present, to which Craft replied that he did not.

{¶8} Ultimately the court found that there was sufficient evidence of a threat to warrant a domestic violence CPO for both Clementz and McBeth. The court entered the CPO into effect for five years. Among the stipulations of the CPO was that Craft could not "possess, use, carry, or obtain any deadly weapon" for the duration of the CPO and that he would have to turn over all of his firearms to local police.

{¶9} This appeal followed and Craft asserts one assignment of error for our review.

### ASSIGNMENT OF ERROR I

**THE TRIAL COURT ABUSED IT'S [sic] DISCRETION AT THE FINAL CIVIL PROTECTION ORDER PRO SE HEARING WHEN THE COURT FAILED TO CONTINUE THE FINAL HEARING, PRECLUDED THE TESTIMONY OF A DESIRED WITNESS AND DID NOT OFFER THE RESPONDENT OPPORTUNITY TO PROFFER TESTIMONY TO DETERMINE WHETHER THE OUTCOME WOULD HAVE BEEN DIFFERENT AND CONSEQUENTLY THE RESPONDENT WAS SUBSEQUENTLY DENIED A CONSTITUTIONAL RIGHT TO BEAR ARMS.**

{¶10} When granting a domestic violence CPO, the trial court must find that petitioner has shown by a preponderance of the evidence that petitioner or petitioner's family or household members are in danger of domestic violence. *Felton v. Felton*, 79 Ohio St.3d 34, 679 N.E.2d 672, 1997-Ohio-302, paragraph two of the syllabus. Moreover, the decision by a trial court to issue a CPO should be "based upon the facts and circumstances before it, including the weighing of witness credibility." *Smith v. Smith*, 3d Dist. No. 16-01-03, 2001-Ohio-2139.

{¶11} The decision whether to grant a CPO is within the sound discretion of the trial court, and an appellate court will not reverse the trial court's decision absent an abuse of discretion. *Brubaker v. Farr*, 3d Dist. No. 13-05-32, 2006-Ohio-2001. To find an abuse of discretion, we must determine that the trial court's decision was unreasonable, arbitrary, or unconscionable, and not merely an error of law or judgment. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶12} R.C. 3113.31 provides for a petitioner's right to request a CPO on behalf of herself or anyone living in the residence with her to obtain protection from domestic violence. Domestic violence is defined in R.C. 3113.31(A)(1) as follows:

> **(1)  "Domestic violence" means the occurrence of one or more of the following acts against a family or household member:**

**(a)  attempting to cause or recklessly causing bodily injury;**

**(b)  placing another person by the threat of force in fear of imminent serious physical harm or committing a violation of section 2903.211 or 2911.211 of the Revised Code;**

R.C. 3113.31(A)(1).

{¶13} In this case, the court determined there was some competent credible evidence to issue a domestic violence CPO under R.C. 3113.31 based upon the testimony of Clementz that she and her husband were threatened with a gun. In the order of protection, the court stated that "[t]he respondent threatened the petitioner with death. [A] firearm was present." (Doc. No. 10).

{¶14} According to Clementz, Craft came to her house on June 20, 2011, and he pulled a gun, a loaded .357 magnum, on her husband and herself and then threatened each of them, stating, "I have a gun. I could kill you." (July 18, Tr. at 4).

{¶15} Craft admits that he entered the Clementz/McBeth property with a gun concealed in his pocket and that he pulled the gun out and brandished it during the 'struggle.' Clementz testified at the ex parte hearing that McBeth held the wrist of Craft so "[Craft] couldn't point [the gun] at him." (July 7, Tr. at 4). She further testified at both the ex parte hearing and the final hearing that while Craft brandished the gun he screamed, "I have a gun. I can kill you." (July 18, Tr. at 6).

-6-

{¶16} In addition, Clementz stated during cross-examination that after Craft and McBeth had already broken apart from their struggle and Craft was getting into the car to leave, Craft made a second threat.

> **A.    [Clementz] And I asked you to leave and I told you to put the gun away. You pointed it towards the ground, and then as you were getting in the car you repeated that to me,--**
> **Q.    [Craft] No.**
> **A.    [Clementz] --, that you had a gun, you would kill me.**

(July 18, 2011 Tr. at 6).

{¶17} Though Craft argues that he pulled the gun only in self-defense, the court found Clementz's testimony credible that Craft unjustifiably brandished the gun at her and McBeth and threatened both of them.  In sum, the trial court found that Craft entered onto the Clementz/McBeth property with a weapon, engaged in a struggle with the unarmed McBeth, then pulled a gun out and twice threatened Clementz and McBeth.  The second threat was made after Craft and McBeth had broken apart.

{¶18} With some competent credible evidence in the record to support a threat being made to both Clementz and McBeth, we find that the court's decision to issue the CPO was not arbitrary or unreasonable nor against the weight of the evidence.

{¶19} Turning to Craft's arguments in his assignment of error.  Craft argues first that the trial court erred in not granting him a continuance despite his

complete failure to request one. His argument is based upon the following

dialogue:

> **THE COURT: Sir, at this time do you have any witnesses you wish to call to testify?**
> **WILLARD CRAFT: No. She wasn't able to come today.**
> **THE COURT: Alright. And do you wish to testify?**
> **WILLARD CRAFT: Yes, I do.**
>
> **\* \* \***
>
> **WILLARD CRAFT STEPPED DOWN**
>
> **THE COURT: Mr. Craft, anything else you wish to present?**
> **WILLARD CRAFT: Not at this time, no.**
> **THE COURT: Ms. Clementz-McBeth, any other testimony or evidence you wish to present?**
> **MARY CLEMENTZ-MCBETH: No, Sir.**
> **WILLARD CRAFT: Sir?**
> **THE COURT: Yeah.**
> **WILLARD CRAFT: May I also say that I do have a witness to everything.**
> **THE COURT: Well, you didn't bring 'em today.**
> **WILLARD CRAFT: I know. That was,--**
> **THE COURT: Whether you have one or not doesn't really help you out any if they're not here.**
> **WILLARD CRAFT: I know.**

(July 18, 2011 Tr. at 7-8, 11-12).

{¶20} Despite his failure to request a continuance or articulate his desire for

a continuance, Craft argues the court should have had the 'common sense' to grant

a continuance on its own. We disagree. Courts are not required to *sua sponte*

issue a continuance. *Gannon v. Gannon*, 6th Dist. No. WD-07-078, 2008-Ohio-

4484, ¶ 43. It is not the responsibility of the court to make sure parties are

prepared or to grant a continuance where one was not requested. Though some leeway is often given to pro se litigants, "ordinary civil litigants proceeding *pro se* * * * are not entitled to special treatment." *McKinnie v. Roadway Express*, 341 F.3d 554, 558 (6th Cir. 2003).

{¶21} If Craft wanted a continuance, he needed to articulate his desire for one. But even if Craft did request a continuance, it is uncertain whether one would have been granted. Granting a continuance is within the trial court's discretion. *Graham v. Audio Clinic*, 3d Dist. No. 5-04-35, 2005-Ohio-1088, at ¶ 26, citing *State v. Marine*, 141 Ohio App.3d 127, 133, 750 N.E.2d 194, 2001-Ohio-2147. Absent a request and a showing of good cause why his witness could not attend, *and* a denial by the trial court we find Craft's argument on this matter to be without merit. Nor do we find any merit in Craft's argument that by its failure to grant a continuance the trial court affirmatively precluded the testimony of additional witnesses.

{¶22} In addition to arguing that the court precluded his witness from testifying, Craft argues that the court did not give him the chance to proffer the testimony of his absent witness. However, as shown above, the court asked Craft if he had anything else he wished to present other than his own testimony. Craft did not attempt to proffer any testimony of the absent witness and there is no record of such a request to proffer.

{¶23} In support of his argument that Craft was unfairly denied these requests, and thus denied a full right to be heard, Craft cites the case of *Spigos v. Spigos,* 10th Dist. No. 03AP-682, 2004-Ohio-757. Specifically, Craft cites the section in *Spigos* stating: "we hold that where the issuance of a protection order is contested, the court must, at the very least, allow for presentation of evidence, both direct and rebuttal, as well as arguments." *Id.* at ¶15 quoting *Deacon v. Landers*, 68 Ohio App.3d 26, 29-30, 587 N.E.2d 395 (4th Dist. 1990). However, it is clear from the record that the court did allow both sides to present and rebut testimony, and the court did allow both sides to make arguments. Both sides were free to call witnesses, Craft just failed to supply his.

{¶24} Moreover, *Spigos* is clearly distinguishable from this case. In *Spigos* (where there was a reversal), the court, without warning, interrupted testimony of the pro se appellant at a final CPO hearing, spoke with opposing counsel alone off the record, then entered a judgment before appellant could finish testifying. *Id.* at ¶ 16. Unlike appellant in *Spigos*, Craft was given a full opportunity to cross examine the two witnesses, present evidence on his own behalf, and call his own witnesses. Craft's testimony was not interrupted as it was in *Spigos* and judgment was not entered until after Craft had said he had no further testimony to present. Therefore, we also find this argument without merit.

{¶25} We turn now to Craft's argument that imposition of the CPO infringed upon his Second Amendment right to bear arms. Under the terms of the CPO, Craft was prohibited from possessing a deadly weapon for the term of the CPO's effect, five years. Additionally, Craft was required to turn over all of his firearms to local authorities. The operative provision of the CPO reads, "[r]espondent shall not possess, use, carry, or obtain any deadly weapon. Respondent shall turn over all deadly weapons in Respondent's possession to the law enforcement agency that serves Respondent with this Order * * *." The provision concludes with the statement that "[a]ny law enforcement agency is authorized to take possession of deadly weapons pursuant to this paragraph and hold them in protective custody until further Court order." (Doc. No. 10).

{¶26} Craft cites the United States Supreme Court's holding in *District of Columbia v. Heller*, 554 US 570, 128 S.Ct. 2783 (2008), to support his Second Amendment claim. In *Heller*, the Supreme Court struck down an absolute prohibition on handgun ownership held and used for self-defense in the home, essentially finding that the Second Amendment protects a private right to bear arms in the home for the purpose of self-defense. *Heller* at 636, 128 S.Ct. at 2822. The holding from *Heller* was later determined by the United States Supreme Court to be applicable to the states through the Tenth Amendment in *McDonald v. Chicago*, 130 S.Ct. 3020, 3050 (2010).

{¶27} While the private right to have handguns in the home for the purposes of self-defense has been deemed applicable to the states through *McDonald*, the Supreme Court was careful in *Heller* to narrow the scope of its holding: "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Heller* at 626, 128 S.Ct. at 2816.

{¶28} In elaborating upon the limitations in *Heller*, the Supreme Court said,

**[a]lthough we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.**

*Id*. at 626-27, 128 S.Ct. at 2816-17. The court continued, adding, "[w]e identify these presumptively lawful regulatory measures only as examples; *our list does not purport to be exhaustive. Id*. at 627, 128 S.Ct. 2817, fn. 26 (Emphasis added). By this language the Supreme Court suggests that the right to bear arms is not absolute and certain settled longstanding restrictions might easily fall under 'presumptively lawful regulatory measures.' *Id*.

{¶29} Moreover, the Supreme Court took specific notice that the holding in *Heller* would have been inapplicable to Heller if Heller was in some way disqualified from owning a firearm. "Assuming that Heller is not disqualified from the exercise of Second Amendment rights, the District must permit him to

-12-

register his handgun and must issue him a license to carry it in the home." *Id*. at 635. Thus if Heller was disqualified due to a lawful regulation, his right to bear arms could be restricted.

{¶30} By the reasoning in *Heller*, if Craft's Second Amendment right was being restricted by a lawful measure, the restriction would be valid. Looking at how restrictions in R.C. 3113.31 have been treated in challenges to other constitutional issues, the Second District Court of Appeals in *Calicoat v. Calicoat*, 2nd Dist. No. 08CA32, 2009-Ohio-5869, examined whether the provision of R.C. 3113.31 "authorizing exclusion of perpetrators of domestic violence from the residences of their victims" violated the "takings" clause of the Fifth Amendment. *Calicoat v. Calicoat*, 2nd Dist. No. 08CA32 2009-Ohio-5869, ¶ 38. In analyzing this issue, the court said:

> **The protection of victims of domestic violence from further harm has as its purpose the protection of the public welfare, which is a proper exercise of the police power conferred on the General Assembly by Section 1, Article II of the Ohio Constitution. * * * Orders issued pursuant to that section constitute valid exercises of the police power that supersede the constitutional protections against takings of private property on which [appellant] relies.**

*Id*. at ¶ 38.

{¶31} Though the discussion in *Calicoat* centers on violations of the Fifth Amendment, we agree with the Second District's finding that R.C. 3113.31 constitutes a valid exercise of police power that can supersede constitutional

protections. Furthermore, we find the same public welfare analysis applicable here.

**{¶32}** Still, while the potential restriction on the right to bear arms may be a constitutionally valid exercise of police power, we recognize the need for a CPO restriction to be related to the specific conduct the restriction seeks to prevent. In determining the reasonableness of a CPO restriction, we have previously held that there must be a "sufficient nexus" between the restriction in the CPO and the conduct the court is trying to prevent. *Maag v. Maag*, 3d. Dist. No. 16-01-16 2002-Ohio-1401.

**{¶33}** In *Maag*, a domestic violence CPO was awarded after an incident of threatened violence. *Id*. The incident did not involve drugs or alcohol, and there was no evidence on the record stating that appellant had a drug or alcohol problem. *Id*. The CPO, however, restricted appellant from consuming alcohol. *Id*. We found that the restriction did not bear a sufficient nexus to the conduct the court was trying to prevent and therefore struck the provision. *Id*.

**{¶34}** Our reasoning in *Maag* is reinforced in the case of *Butcher v. Stephens*, 182 Ohio App.3d 77, 911 N.E.2d 928, 2009-Ohio-1754. In *Butcher*, the Fourth District Court of Appeals found a CPO provision that appellant refrain from owning a firearm was unduly restrictive where weapons played no part in the

domestic violence. *Butcher* at ¶ 17. The *Butcher* court found the "sufficient nexus" we required in *Maag* was lacking, and therefore struck the provision.

**{¶35}** However, unlike the *Maag* and *Butcher* cases, in this case, Craft specifically used a gun in making threats to Clementz and McBeth, and according to the findings of the trial court, Craft threatened Clementz and McBeth with death while brandishing the firearm. Craft also explicitly mentioned the gun in the threat, "I have a gun. I can kill you." (July 18, 2011 Tr. at 6).

**{¶36}** This situation is easily distinguishable from *Butcher* where firearms were not involved and were not related to the conduct. Here, the firearm specifically relates to the incident and to the conduct the court was attempting to prevent. Therefore we find that there is a sufficient nexus between the restriction and the conduct to be prevented.

**{¶37}** Furthermore, our finding that there is a sufficient nexus in this case is consistent with decisions from other appellate districts prior to the *Heller* decision. For example, the Fifth and Ninth District Courts of Appeals have held that threats to shoot the victim were sufficient to warrant a firearm restriction in a CPO. *Mann v. Sumser*, 5th Dist. No. 2001CA00350, 2002-Ohio-5103 ¶¶ 33-34, *Gaydash v. Gaydash*, 168 Ohio App.3d. 418, 860 N.E.2d 789, 2006-Ohio-4080, ¶ 19 (9th Dist.).

**{¶38}** In sum, as the CPO restrictions are supported by the evidence and there is a sufficient nexus between the restriction and the conduct to be prevented in this case, we find that Craft's Second Amendment right has not been violated.

**{¶39}** For all of these reasons, the assignment of error is overruled.

*Judgment Affirmed*

**WILLAMOWSKI and ROGERS, J.J., concur.**

**/jlr**