[Cite as *Ehlers v. Thomas*, 2024-Ohio-2531.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

| | | |
|---|---|---|
| BROOKE EHLERS, | : | |
| Appellee, | : | CASE NOS. CA2023-07-052 |
| | | CA2023-07-053 |
| | : | |
| - vs - | | O P I N I O N |
| | : | 7/1/2024 |
| ANTHONY THOMAS, et al., | : | |
| Appellants. | : | |

APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
Case Nos. 23 CS 4386 and 23 CS 4387

Smith, Meier & Webb, LPA, and Mark Webb, for appellee.

Barron, Peck, Bennie & Schlemmer, Co., LPA, and Matt Miller-Novak, for appellants.


**HENDRICKSON, J.**

{¶ 1} Respondents/Appellants, Anthony Thomas and William Petrey (collectively, "Appellants"), appeal the trial court's adoption of a magistrate's decision granting a civil stalking protection order ("CSPO") in favor of Petitioner/Appellee, Brooke Ehlers.

**Factual Background**

{¶ 2} Ehlers is the director of the Montgomery County Coroner's Office ("MCCO"). In August of 2022, Appellants made public records requests to the MCCO regarding the

deaths of, among other individuals, Casey Pitzer and Marvin Napier. Appellants believe those deaths were part of a coverup by the MCCO and other government entities. Pitzer and Napier were autopsied at the MCCO.

{¶ 3} Appellants largely communicated with Ehlers via her work email. Over time, the emails sent to Ehlers grew more numerous and confrontational. Some emails contained threats of criminal charges, "legal war," and internet smear campaigns if the records Appellants desired were not turned over to them. However, one email from Petry also contained autopsy photos as well as pictures of Ehlers' family taken from social media. The email asked, "[W]hat if it was your daughter?" The email continued:

> If we don't get the records immediately. I'm [sic] putting you and every photo I can find of you all over the internet as one of the MURDER COVER UP doctors * * * Your family will be crushed and embarrassed. * * *
>
> It's not going to be right of you to allow your family to be put out there like that. But the fact is, the more you ignore us, the angrier we get. As any parent would. I hope to hear from you by the end of the day. If not, I'll start sending you the TRUE internet posts I create about you. * * *

{¶ 4} Thomas, in turn, stated in one email that because of the alleged actions of Ehlers and others, the entire world, "WILL KNOW WHY PEOPLE BURN OUR FYCKING [sic] CITIES AND HAVE NO RESPECT FOR LAW ENFORCEMENT!! THEY'RE LIARS AND AID IN MURDERS." At one point, Thomas attempted to "friend" Ehlers on Facebook and sent her a message which stated, "I see you're a hometown Clinton County Resident!! * * * this could be good or bad. I hope good, I really do, FYI my friend is employed by NCIS. I served with him in the Marines. We will catch Casey's killer!!" The above are just some of the many communications that Appellants sent to Ehlers.

{¶ 5} On February 24, 2023, Appellants personally went to the MCCO in an attempt to receive records. Ehlers was not there that day. Appellants' interaction with

other workers at the MCCO became very contentious, but non-violent. Appellants were eventually escorted from the MCCO by Dayton Police. The magistrate's decision granting the CSPO, discussed further below, stated it gave little weight to this incident.

{¶ 6} Ehlers later filed for a CSPO against Appellants and was granted an ex parte CSPO the same day. A hearing was later held. Ehlers was represented by counsel, and Appellants appeared pro se.

{¶ 7} The magistrate found that Appellants "knowingly engaged in a pattern of conduct that caused [Ehlers] to believe that [Appellants would] cause physical harm or cause or [have caused] mental distress" and issued a CSPO. The CSPO ordered that Appellants "shall not make any additional posts online which specifically name petitioner," and it also prohibited Appellants from possessing any deadly weapons, including firearms.[1] The term of the CSPO is five years.

{¶ 8} Appellants filed objections to the magistrate's decision, asserting that there were several incorrect factual findings and rulings. The objections also stated the online speech and firearm restrictions violated their constitutional rights. The trial court overruled Appellants' objections. This appeal followed.

{¶ 9} Appellants raise a single assignment of error:

**THE TRIAL COURT ERRED IN GRANTING A CSPO THAT RESTRAINS FUTURE ONLINE SPEECH AND THE POSSESSION OF FIREARMS.**

{¶ 10} Appellants argue that the CSPO violates their First Amendment rights

---

1. The Magistrate's order prohibited Appellants from possessing all types of "deadly weapons." Appellants, however, frame their assignment of error solely in terms of "firearms." We will do the same. We note that "Deadly weapon" means any instrument, device, or thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed, carried, or used as a weapon." R.C. 2923.11(A). Firearms, are "any deadly weapon capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant [and] * * * includes an unloaded firearm, and any firearm that is inoperable but that can readily be rendered operable." R.C. 2923.11(B). Therefore, firearms are a subset of deadly weapons.

because it unlawfully restrains future, protected speech. In addition, Appellants assert that the restriction on their right to possess a firearm was plain error and not supported by any evidence.

{¶ 11} As an initial matter, we note Ehlers' comment in her brief that Appellants' objections to the magistrate's decision were merely a "'laundry list' of potential objections * * *." Such a statement appears to invoke Ohio Civ.R. 53(D)(3)(b)(ii)'s requirement that objections to a magistrate's decision "be specific and state with particularity all grounds for [the] objection."

{¶ 12} In cases where a party does not properly object to a magistrate's decision that party has waived all but plain error. *Doran v. Doran*, 2009-Ohio-5521, ¶ 15 (12th Dist.). "Plain errors" are errors which affect "the basic fairness, integrity, or public reputation of the judicial process and therefore challenged the legitimacy of the underlying judicial process." *State v. Morgan*, 2017-Ohio-7565, ¶ 41.

{¶ 13} Here, the plain error doctrine doesn't apply because we find that Appellants sufficiently objected below to the magistrate's decision on the constitutional grounds they are raising in this appeal. Even if Appellants failed to properly object below, we have already found improper weapon restrictions to constitute plain error. *See Doran* at ¶ 38. Therefore, we will address the merits of Appellants' constitutional arguments raised in their brief.

## A. Speech Restrictions

{¶ 14} A foundational element of United States law is that under the First Amendment, the "'government [generally] has no power to restrict expression because of its message, its ideas, its subject matter, or its content.'" *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 65 (1983), quoting *Police Dept. of Chicago v. Mosley*, 408 U.S. 92,

95 (1972); *See also Ashcroft v. Am. Civil Liberties Union*, 535 U.S. 564, 573 (2002). Such restrictions are "presumptively unconstitutional" and must demonstrate that they are "the least restrictive means to achieve a compelling state interest." *Bey v. Rasawehr*, 2020-Ohio-3301, ¶ 22, citing *See Reed v. Gilbert,* 576 U.S. 155, 163 (2015). This standard is called "strict scrutiny." *Id.*

{¶ 15} Notably, the content of the speech can be prohibited under select circumstances including "'advocacy intended, and likely, to incite imminent lawless action; obscenity; defamation; speech integral to criminal conduct; so-called 'fighting words'; child pornography; fraud; true threats; and speech presenting some grave and imminent threat the government has the power to prevent . . .'" *Id.* at ¶38, quoting *United States v. Alvarez*, 567 U.S. 709, 717 (2012) (plurality opinion). Generally, Ohio's CSPO statutes, including R.C. 2903.211 and 2903.214, restrict menacing behavior that "is threatening or interferes with the rights of others by causing mental distress." *Coleman v. Razete*, 2019-Ohio-2106, ¶ 25 (1st Dist.). If the menacing behavior involves speech, however, restrictions cannot stifle the expression of the speech's content. *See id.*, citing *State v. Smith*, 126 Ohio App.3d 193, 210 (7th Dist.1998).

{¶ 16} In some cases, it can be difficult to determine if restrictions on speech are because of their content. Seemingly content-neutral restrictions, which are subject to a different legal standard,[2] can instead be content based. In *Bey*, the Ohio Supreme Court scrutinized a CSPO order which ordered the appellant to "(1) refrain from posting about appellees on any social-media service, website, discussion board, or similar outlet or

---

2. "Content-neutral regulations limiting the time, place, and manner of speech are constitutional as long as they promote 'important governmental interests unrelated to the suppression of free speech and do[ ] not burden substantially more speech than necessary to further those interests.'" *Bey* at ¶ 23, quoting *Turner Broadcasting Sys., Inc. v. Fed. Communications Comm.*, 520 U.S. 180, 189 (1997).

service and (2) refrain specifically from posting about the deaths of appellees' husbands in any manner that expressed, implied, or suggested that appellees were culpable in those deaths." *Bey* at ¶ 32.

**{¶ 17}** In rejecting the appellee's argument that the restrictions were content neutral because it regulated the "target" of speech, versus its content, the court held that "a regulation of speech 'about' a specific person (or likely any other specific subject of discussion) is a regulation of the content of that speech and must therefore be analyzed as a content-based regulation." *Id.* at ¶ 33.

**{¶ 18}** The *Bey* Court then observed that because the restraint restricted future speech, the trial court should have made a judicial determination of whether the restricted speech fell into one of the categories capable of being restricted, including speech "integral to criminal conduct." ¶ 46-47. This determination is critical because there is a heavy presumption against the validity of prior restraints on speech. *Id.* at ¶ 43, quoting *O'Brien v. Univ. Community Tenants Union, Inc.*, 42 Ohio St.2d 242, 246 (1975). The Court noted that the law may punish someone for what they have previously said but typically does not prevent someone from saying something in the future. *Id.*[3] The Court concluded that "[b]ecause of the uncertainty inherent in evaluating future speech that has yet to be expressed, the record . . . cannot justify a content-based prior restraint on speech . . ." *Id.* at ¶ 47.

**{¶ 19}** Finally, the *Bey* Court found the restriction was not the least restrictive means to protect a compelling state interest. *Id.* at ¶ 51. In doing so, the Court assumed

---

3. "[A] free society prefers to punish the few who abuse rights of speech after they break the law than to throttle them and all others beforehand.'" *Obrien* at ¶ 43, quoting *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 559 (1975).

for the sake of argument that CSPO laws' stated purpose of "protecting civil-stalking victims from fear of imminent physical harm or mental distress" was a compelling state interest. *Id.* However, the Court found that because all speech about the appellees, "no matter how innocuous" could violate the CSPO, the restriction was "demonstrably overbroad." *Id.*

{¶ 20} Here, the restrictions placed on Appellants' online speech are very similar to the ones at issue in *Bey*. We can state it no better than the *Bey* court did and observe the CSPO's order that Appellants delete and not post any social media videos and posts which "specifically name" Ehler "necessarily concerns the subject matter of the speech [and] 'cannot be justified without reference to the content of the prohibited communication.'" *Id.* at ¶ 35, quoting *People v. Relerford*, 2017 IL 121094, ¶ 34. Stated differently, the restriction "requires an examination of its content, i.e., the person(s) being discussed, to determine whether a violation has occurred and is concerned with undesirable effects that arise from the direct impact of speech on its audience or [l]isteners' reactions to speech . . ." (Cleaned up) *Id.* at ¶ 35.

{¶ 21} Also similar to the facts in *Bey*, the trial court in this case did not determine whether Appellant's speech fell into one of the categories of speech capable of being restricted before ordering a prior restraint on Appellants' speech.

{¶ 22} Even if it had, the CSPO's blanket prohibition on using Ehler's name is not the least restrictive means by which to protect Ehlers. We will assume for the sake of argument, like *Bey*, that "protecting civil-stalking victims from fear of imminent physical harm or mental distress" is a compelling state interest. While the speech restriction in *Bey* prohibited "posting *about*" an individual, the restrictions in this case ordered Appellants to refrain only from "specifically naming" Ehler in internet posts.

Hypothetically, Appellants could still talk about Ehlers, as the director of the MCCO, and the alleged activities of that office without directly naming Ehlers. Even so, the restriction still prevents use of Ehler's name in all contexts, including, presumably, the only reason Appellants would talk about Ehlers at all – in connection with the underlying facts of this case. Therefore, we find these restrictions demonstrably overbroad.

{¶ 23} Ehlers argues the order is "tailored only to protect [her] and her family," but the CSPO provides no protection to Ehlers (or her family by indirect extension) outside of not being directly named in any of Appellants' posts, regardless of the subject. We see no compelling state interest in providing Ehlers, a public official, with such anonymity. While public officials are still entitled to the protection of the law, they may always be the subject of direct comment and criticism. *T.D. v. C.N.*, 2018-Ohio-1840, ¶ 46 (8th Dist.).

{¶ 24} We will echo *Bey* one final time and note that while the "CSPOs issued here undoubtedly sought to provide some measure of relief to [Ehlers] for the mental distress [she and her family] experienced because of [Appellant's] public accusations . . . the means chosen to provide that relief . . . went far beyond anything that the factual record before us can sustain and the First Amendment can tolerate." *Id.* at ¶ 61. Therefore, we agree with Appellants that the restrictions on their speech were unconstitutional.

### B. Firearm Restrictions

{¶ 25} Appellants argued on appeal that the magistrate's firearm restriction was not supported by sufficient evidence.

{¶ 26} We have previously held a weapon restriction that "lacks a sufficient nexus with the conduct the trial court was attempting to prevent . . ." is an unconstitutional restraint on an individual's Second Amendment right to bear arms. *See Doran*, 2009-Ohio-5521 at ¶ 33, 38, citing *Maag v. Maag*, 2002 WL 468585 (3rd. Dist. Mar. 28, 2022).

*See also Clementz-McBeth v. Craft,* 2012-Ohio-985, ¶ 38 (3rd. Dist.). Similarly, our sister courts found weapons restrictions in a CSPO to be inappropriate "where no evidence is presented that the respondent used or threatened to use a deadly weapon to harm the petitioner." *Id.* at ¶ 34, citing *Newhouse v. Williams*, 2006-Ohio-3075 ¶ 16 (3rd Dist.); *see also Boals v. Miller*, 2011-Ohio-1470, ¶ 39 (5th Dist.); *F.-S. v. Pacek*, 2015-Ohio-4310, ¶ 17 (9th Dist.).

**{¶ 27}** In this case, Appellants' communications with Ehlers are certainly troubling in several respects: (1) juxtaposing gruesome autopsy photos with photos of Ehler's family and asking "[W]hat if it was your daughter?"; (2) threatening to "expose" Ehlers and her family over the internet to be "crushed" and "put out there like that" for the entire world to see and grow angry with; (3) asserting alleged actions like Ehlers' are why people "burn our fycking [sic] cities and have no respect for law enforcement!!"; and (4) tracking down Ehlers' personal Facebook page, attempting to friend her, commenting on where she lived, and asserting that Thomas and his friend with the NCIS, both former marines, would catch Casey Pitzer's alleged killer.

**{¶ 28}** However, no evidence was presented that Appellants used or threatened the use of a firearm against Ehlers or anyone else involved in the underlying facts of this case. Additionally, no evidence was even presented on whether Appellants own firearms. The underlying dispute of this case has been contentious, and the language used by Appellants has been, at times, hostile. Additionally, the mere mention of Ehler's family, which has no connection to the case, is very concerning. While the trial court's prohibition of deadly weapons likely sought to prevent any deadly escalation of this antagonistic conflict, it is clear the restriction does not have a sufficient nexus to Appellants' conduct because there is no evidence that Appellants used or threatened to use a firearm to harm

Ehlers or anyone else involved in this case.

{¶ 29} As a result of the foregoing, we sustain Appellants' single assignment of error.

{¶ 30} Judgment reversed and remanded for proceedings consistent with this opinion.

S. POWELL, P.J., and BYRNE, J., concur.