[Cite as *K.H. v. P.M.*, 2025-Ohio-263.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
ERIE COUNTY

K.H.                                                    Court of Appeals No. E-23-059

      Appellee                              Trial Court No. 2023DTCPO00004

v.

P.M.                                                    **DECISION AND JUDGMENT**

      Appellant                             Decided: January 24, 2025

* * * * *

Mark P. Smith, for appellee.

Christopher L. Trolinger, for appellant.


* * * * *

**MAYLE, J.**

{¶ 1} Appellant, P.M., appeals the November 15, 2023 judgment of the Erie County Court of Common Pleas granting a civil protection order against him to appellee, K.H.[1]  For the following reasons, we affirm the trial court's decision to issue the protection order, but modify the order to remove the deadly-weapons restrictions.

---

[1] K.H. did not file a brief or otherwise participate in this appeal.

## I. Background and Facts

### A. K.H.'s testimony

{¶ 2} In her testimony, K.H. said that she and P.M. began dating in January 2021. When she got pregnant in October 2021, she was living in Bowling Green but was "going back and forth" between her home and P.M.'s home.

{¶ 3} In July 2022, after the parties' daughter was born, K.H. went to Sandusky to stay with her parents so they could help her with the baby. She lived with them until September, when she moved into her own house in Sandusky. While she lived with her parents, she had daily contact with P.M. through text messages, and he came to visit a few times.

{¶ 4} According to K.H., P.M. had a "complete personality change" after their daughter was born. He became "explicitly mentally abusive[;]" would "speak out of both sides of his mouth[;]" would tell her that he did not want to be in a relationship, "but then act like that[;]" and accused her of being a "whore." K.H. felt "[d]evastated, confused, hurt, traumatized, definitely traumatized" when P.M. said that he did not want to be in a relationship with her and called her a whore.

{¶ 5} On September 28, 2022, P.M. came to K.H.'s house for a planned visit. She said that he was acting "normal" when he arrived. Later in the day, K.H. "wanted to talk about [their] relationship to get some clarity of what that entailed or meant . . . [,]" which agitated P.M. During the conversation he "became very accusatory and angry, aggressive, agitated and . . ." called her a whore. She described his aggressiveness as

2.

"his demeanor, his physical stance, and . . . his words toward [her] . . ." and said that he was "propped up, forward" instead of just sitting on the couch. P.M.'s change of demeanor made her feel "confused and not good" so she asked him to leave. She went to put the baby to bed and when she returned, P.M. was still there. She asked him to leave a second time and, although he did not leave right away, he eventually left the house.

{¶ 6} At the end of the argument, right before he left, P.M. punched a hole in the wall. K.H. was standing beside the area he punched, and he punched his fist into the wall next to her head. She believed that his punch was "meant for [her] and it was a message." This made her feel "[t]errified" because she thought the punch would have caused her "very serious harm." Although K.H. moved away from P.M., he followed her and continued to yell things in her face, but she could not recall what he was yelling. When he finally left, she locked the door and windows and "went to [her] baby." She did not report this incident to law enforcement, which she explained was because she thought that she was "in shock." She claimed that she was still terrified "today."

{¶ 7} The morning of October 13, 2022, while K.H. was doing laundry on the second floor of her house, she heard a loud knock. She looked around the corner into the bedroom and saw P.M. standing in the open sliding door that led to a "balcony" or "overlook." He walked in through the unlocked door even though K.H. did not give him permission to come into her house. He sent her text messages a couple of minutes before coming in, but she did not see them before he got there. P.M. told her that he wanted to get his things and left after getting them. K.H. described him as "upset" and

3.

"aggressive." This incident made her feel "[t]errified because [she] wasn't sure why he was there." When she saw him, she got her phone in case she "needed to call somebody, . . ." and after he left, she told a friend that he had been in her house "just in case if somebody would know."

{¶ 8} When P.M. left, he sent K.H. a text message saying that he was going to eat. Soon after, he came back to her house. He came to the front door, and when she opened it, he came in, said he wanted to speak with her, sat down, and talked about what had been going on in his life for the past couple of weeks. K.H. had not told him that he could not come in. When the conversation began to get heated, she told him to leave. P.M. left when she asked. K.H. did not report either incident from that day to law enforcement because her "mind was still trying to figure out what was actually going on."

{¶ 9} As a result of these two incidents, K.H. took the baby and went to stay with her parents for about a month because she did not feel safe in her house. She also replaced "a lot" of the windows and doors in her house because they did not lock correctly. She returned home after the windows and doors were replaced.

{¶ 10} On December 18, 2022, P.M. left a coffee mug in K.H.'s mailbox. K.H. interpreted P.M.'s trip to her house to deliver the mug as "going out of his way to intimidate and harass and stalk [her]."

{¶ 11} P.M. also sent K.H. several text messages that day, which she submitted as exhibits. In the messages, he told her that he came by to drop off a gift, said that he "[s]aw [K.H.] from the road holding [their daughter] . . ." and was "glad to know [K.H.

4.

was] still alive[,]" offered to take her out to breakfast, offered to bring her food from his farm, and said that he was "still planning to swing by for Christmas" to visit the child. The messages made K.H. feel "[s]hocked, violated, [and] scared . . . ." After the earlier episodes, K.H. no longer felt safe and did not want to be in the house anymore. She interpreted the message from P.M. about visiting on Christmas as "[h]arassing, intimidation, that he wasn't interested in any kind of holiday. It's just letting [her] know I can do as I please and come and go as I please in your own home. You're not safe." She continued to receive messages from P.M. through April 2023, but did not respond to any of them.

{¶ 12} On April 5, 2023, K.H. heard a loud knock, saw P.M.'s stepmother's truck drive away, and saw a bag on her porch. She found this "terrifying" because "now he was advancing onto the property and leaving things there." K.H. admitted that she had never sent P.M. a message or otherwise told him that he could not come onto her property. She also never gave him affirmative permission to contact her or come around. K.H. installed a security camera at her house after this incident.

{¶ 13} On April 14, 2023, K.H. filed her petition for a protection order. She waited that long because she "wasn't aware of what was legally available, and so when [she] became aware, that's when [she] took action."

{¶ 14} In June 2023, after K.H. filed her CPO petition, she received a handwritten letter from P.M. in the mail. In the letter, P.M. wrote that he loved and cared for K.H. and missed talking to and doing things with her. He said that they "are soul bound and

nothing will ever change that." He also offered to help with the baby and said, "I would LOVE to be able to feed you and [the baby] but I understand if you are having trust issues and I dont [sic] want to be wasteful." (Emphasis in original.) He went on to explain that he understood that K.H. needed him out of her life to feel at peace and that "[b]eing ostracized is much better for everyone than what happened last time [he] visited." Finally, he wrote that his "hope is that we can get along and spend time together as a family one day. [He] will do whatever [he] can to help that happen. . . ."

{¶ 15} The part of the letter in which P.M. called them "soul bound" made K.H. feel "intimidated," and "seem[ed] to reiterate or reinforce previous things said to [her], that he's never going to back off and that, in his mind, somehow we're forever soul bound and nothing will ever change that." She also found P.M.'s statement about feeding her and the baby "suspicious, maybe even threatening." Overall, the letter made her "feel like this is an unstable person."

{¶ 16} Regarding P.M.'s access to deadly weapons, K.H. testified that she owned a 9 mm handgun. The gun was one of the things that she moved into P.M.'s house, where P.M. put it in his safe. It was still in the safe when K.H. moved her things out of P.M.'s house. In April 2022, she asked for her gun back. P.M. planned to give the gun to K.H.'s father at a storage unit in Bowling Green that K.H. was using. K.H. thought—but was not sure—that the gun was in the storage unit when she moved her things from there to her new house in Sandusky. She was certain that the gun was not moved into her new house. Although P.M. had supposedly returned the gun, K.H. believed that he still had

6.

possession of it based on a conversation they had before his September 2022 visit. Before he came to see her that day, he asked if she wanted anything from the storage unit in Bowling Green. She did not. When he got to the house, he "handed [her] a rather large hunting knife and said that [she] could use that for [her] protection." She thought that it was "strange" that he would give her a hunting knife for protection when she owned a gun. She knew for sure that he had the gun at the time she filed her CPO petition, which "[h]orrified" her because she "didn't give him the gun and . . . that could be nefarious. [She] felt that's a threat. . . . Maybe on [her] life." K.H. tried to explain how she knew that P.M. still had the gun, but the magistrate ruled that the testimony was inadmissible because it involved settlement discussions.

{¶ 17} K.H. also knew that P.M. had his own firearms. When K.H.'s attorney asked her if she wanted the CPO to include a term that prohibited P.M. from possessing firearms, she did not answer, but asked counsel to repeat the question. After her attorney explained in more detail that the court could take away P.M.'s right to possess firearms for the duration of the CPO and asked if K.H. wanted that to happen, she again did not respond. Her attorney went on to restate for a third time the court's ability to limit P.M.'s right to possess firearms, to which K.H. responded, "They can say that?" Counsel affirmed that the court could, in fact, do that, and again asked if K.H. was "asking the Court to do that, to prevent [P.M.] from possessing or owning any firearms or other deadly weapons while any order is in place[.]" Following another pause, K.H. replied, "no[,]" but she was "not sure" why.

7.

{¶ 18} K.H. also testified that she had seen P.M. use alcohol and marijuana to the point that it changed his demeanor, but she described the change as "just partying[,]" and denied that his substance use made him angry or belligerent.

{¶ 19} K.H. was requesting the CPO because she was afraid of P.M. due to him punching a hole in the wall of her house, coming into her house unannounced and without permission, observing her and her daughter from the street, telling her that he would be spending Christmas with her, and continuing to send her messages. She believed that P.M. had attempted to cause her physical harm in the past. Additionally, he had caused her mental distress, and she had changed her routine out of fear because of his actions. She also had safety concerns when it came to P.M. and their daughter. The baby had been in the house each time an incident with P.M. occurred. K.H. had not allowed P.M. to see the baby in the months before the hearing because of the "concerning behaviors and behaviors that [she] interpret[ed] to be very threatening and violent and horrifying really."

{¶ 20} On cross-examination, K.H. admitted that she had access to a phone the day that P.M. punched her wall. She did not tell him to leave after he punched the wall. In October 2022, when P.M. came to her house uninvited, K.H. asked him to leave. She explained that the "deck" leading to the back door that P.M. used was only about three feet off of the ground. In December 2022, when P.M. texted that he could see K.H. and the baby from the road, K.H. said that she "was in the room that he could have seen [her] from the road that day . . . ." In April 2023, when P.M. left her food, she threw it away.

8.

She did not tell him to stop leaving gifts at her house after he left the mug or the food.  In June 2023 when she received the letter, she opened it "[t]o know what it had to say."

{¶ 21} K.H. has a security camera at her home but does not pay for a monitored security alarm system.  She has never called the police or 911 to report P.M.'s behavior.  She reiterated that she "never" told P.M. not to contact her.

{¶ 22} K.H. said that she was surprised to hear that P.M. wanted a relationship with their baby.  When P.M.'s attorney asked why, she did not answer.  She had not allowed P.M. to see the baby in the six to nine months leading up to the full hearing.

### B. P.M.'s testimony

{¶ 23} In his testimony, P.M. said that he and K.H. began dating around May of 2021.  K.H. got pregnant in October 2021 and gave birth to the parties' daughter in July 2022.  They lived together "[a]t times" while they were dating; he estimated that there were "about four times she moved her things in and out of [his] place . . ." over that two-year period.  However, their relationship was always rocky.  K.H. generally moved out of P.M.'s house because they were arguing, but he denied that any of the arguments were physical.

{¶ 24} A few days after their daughter was born, K.H. moved to Sandusky.  She lived with her parents for about a month before moving into her own house.  P.M. visited her while she lived with her parents, helped her move some of her things into her new house, and visited her at her new house.

9.

{¶ 25} At the end of September 2022, P.M. and K.H. got into a disagreement while P.M. was visiting their daughter. P.M. said that the argument "lasted four hours" during which K.H. was "shouting obscenities at [him] and causing [his] daughter to cry continuously . . . ." While they were arguing, P.M. was "trying to remain calm so that [he] could proceed with visiting [his] daughter." He did not "remember what [he] said in anger before [he] left."

{¶ 26} P.M. admitted to punching a hole in the wall of K.H.'s house during the argument but disagreed with K.H.'s description of the incident. He said that K.H.'s testimony that she was standing next to him was inaccurate. He claimed that she was about 12 to 15 feet away and in another room when it happened. As P.M. described it, "I had gone to try to comfort my daughter, because she continued to cry, and as I left, I was frustrated and I vented frustration on the wall. [K.H.] was not in the foyer. She was standing in the living room to the left . . . ." He was not aiming at K.H. when he punched the wall, she was not injured in any way, and he left immediately after throwing the punch. The baby was upstairs at the time.

{¶ 27} In October 2022, P.M. came back to K.H.'s house to "collect [his] possessions." He said that he texted K.H. to let her know that he was coming, but she did not respond. Because she did not respond, P.M. went into her house through an unlocked back door. While he was there, he and K.H. "sat down, had a polite conversation, and [he] left" when K.H. asked him to. He sent her another text from outside because he

10.

wanted to see the baby, and as a result, K.H. invited him back into the house. This was the last time that he saw K.H. in person.

{¶ 28} In December 2022, two months after P.M. came to K.H.'s house to retrieve his things, he drove by the house to "drop off a gift from [his] church, trying to reach out and reconnect the relationship" because he was "hoping that [they] could have a relationship and hoping to see [his] daughter." He left the gift (a coffee mug and an invitation to come to his church) in K.H.'s mailbox without pulling into her driveway or getting out of his truck. The text messages that K.H. submitted as exhibits do not show any responses from K.H. P.M. interpreted K.H.'s lack of response as her not wanting to talk to him.

{¶ 29} In April 2023, P.M. "dropped off some food on [K.H.'s] doorstep in an effort to reach out, in an effort to show [his] support for [his] daughter" by giving her food that he had produced on his farm. He "knocked loudly on the door . . ." to ensure that K.H. heard the knock because there were perishable items in the package, dropped off the package, and then left. He did not wait for K.H. to answer the door. P.M. told K.H. that he was going to leave the food. He explained that he had continued to communicate with her "in an effort to connect with" the baby but that it was "nothing unusual" for K.H. to ignore him. He was already in Sandusky that day for a pretrial in the parties' custody case, so he thought that it was a "convenient opportunity to leave a gift on her doorstep while [he] was in town."

11.

**{¶ 30}** In June 2023, after K.H. filed the CPO petition, P.M. wrote her a letter. He "didn't think that putting a letter in the mail was threatening. So [he] did think it was acceptable . . ." to send it because he was "continuing to try to reach out to connect with [K.H.] and [his] daughter . . . ." He explained that the only reason he was trying to have a relationship with K.H. was because "she has [his] daughter" and he felt that he had to have a relationship with K.H. to be able to have a relationship with his daughter. He believed that K.H. filed the CPO petition to "alienate" him from the child. He filed a custody action in January 2023 and thought that K.H. filed the CPO petition in April 2023 "to substantiate a claim that [he] not be allowed to have any visitation." His last scheduled visit with the baby was in September 2022, and he also visited with her in October 2022 when he was at K.H.'s house, but he had not had any contact with her since.

**{¶ 31}** P.M. did not have any ill will toward K.H. or intend to harm her in any way. He had never threatened or attempted to harm her. He had never threatened her with a gun, and a gun was not involved in any of the incidents that she listed in her petition. Neither K.H. nor any of her family members had ever called the police on him, told him not to contact her, or told him not to drop anything off at her house.

**{¶ 32}** On cross, P.M. said that he had never destroyed someone else's property out of anger before the September 2022 incident at K.H.'s house. He agreed with her attorney that it was not an appropriate response and said that he had apologized and offered to fix it. He claimed that "[t]here was no malice or threat intended."

12.

{¶ 33} P.M. admitted that K.H. did not give him "explicit permission" to come onto her property in October 2022. He chose to enter the house through the sliding door, and although K.H. did not invite him in that way, she also did not tell him to get out. K.H.'s attorney described the door P.M. used as a door on a "second story balcony at the back of her house . . . [,]" but P.M. "wouldn't say it was a second story . . . . From the outside it was a step up to gain entry to the back door." P.M. thought he had "understood permission" to go into K.H.'s house that day to get his things because they had been living together, he had possessions at her house, and she did not respond to his messages by telling him not to come to the house.

{¶ 34} Regarding the December 2022 incident, P.M. said that he did not have business in Sandusky or Erie County that day, but had been "at church in Lucas County where [he] picked up the mug, so it was only an hour drive."

{¶ 35} P.M. believed that he and K.H. had to have some type of relationship—albeit not a romantic one—because they have a child together and thought that they should "be able to co-exist peacefully and communicate." He explained that the term "soul bound" that he used in the June 2023 letter was not meant to be romantic and referred to their daughter, and the line about spending time together as a family someday was only about a "parental relationship." He also explained that he had written letters to the baby that he sent to K.H.'s house. K.H. had sent him a text message after receiving the first one telling him that the baby "'liked it a lot[,]'" which he "considered

encouragement" to continue sending letters to the baby because he thought that it would improve his chances of being able to have a relationship with his daughter.

### C. Magistrate's decision

{¶ 36} Following the hearing, the magistrate granted K.H. a five-year CPO against P.M. Under the terms of the order, P.M. is prevented from, among other things, entering or interfering with P.M.'s residence, being within 500 feet of her, having any in-person or electronic contact with her, or causing or encouraging anyone else to do any act prohibited by the order. Provisions 8, 9, and 10 of the CPO—the deadly-weapons restrictions—prevent P.M. from possessing, using, carrying, or obtaining any deadly weapons (provision 8), require him to turn over to law enforcement all deadly weapons that he owns or possesses (provision 9), and alert him that any concealed carry weapon license that he has is subject to suspension or revocation under R.C. 2923.128 (provision 10).

{¶ 37} In his findings of fact, the magistrate found that P.M. testified that he and K.H. had been in a romantic relationship beginning in the late spring of 2021 and had lived together at P.M.'s house several times. Their living situation was unstable because their relationship was "wrought with disagreements[.]" K.H. moved to Sandusky five days after their daughter was born, and P.M. visited them in Sandusky several times.

{¶ 38} During P.M.'s last scheduled visit in September 2022, he punched a hole in the wall of K.H.'s house at the end of a lengthy argument during which P.M. called K.H. a whore. He claimed that he did so in a fit of anger, was 12 to 15 feet away from K.H.,

14.

and "denie[d] there was any attempt to injure or harm [K.H.,]" or that he was a "aiming a punch at her . . . [,]" despite K.H.'s claim that he "just missed hitting her." He had never destroyed property in anger before and said that he had apologized and offered to fix it. He also said that he did not intend to harm K.H. when he punched the wall, that he had no ill-will toward her, and would never hurt the mother of his child.

{¶ 39} In October 2022, P.M. entered K.H.'s house through an unlocked back door to get some of his things. He said that he texted K.H. shortly before he arrived but did not get a response, so he entered through the unlocked door. Although he did not have explicit permission to enter K.H.'s home, he believed that he had implied permission based on K.H. never telling him that he could *not* enter her home. When he returned to K.H.'s house a second time, she let him in.

{¶ 40} In December 2022, P.M. left a coffee mug in K.H.'s mailbox and drove away. The mug was from his church, and he left it both as a gift and as an invitation to attend the church. He sent text messages to K.H. that day telling her that he had put a gift in her mailbox, offering to buy her breakfast, and saying that he "[s]aw [K.H.] from the road holding [the baby] glad to know you are still alive[.]" He also sent her a message telling her that he was "still planning to swing by for Christmas[,]" and that he wanted to give her food from his farm.

{¶ 41} In April 2023, P.M. left food on K.H.'s doorstep. He "pounded" on the door once and left the food when no one answered. He was in town for a hearing in the custody case he had filed in the juvenile court.

15.

{¶ 42} In June 2023, after K.H. filed her CPO petition and after P.M. was served with the petition, P.M. sent K.H. the letter in which he wrote, "'We are soul bound and nothing will ever change that[.]' . . . 'I understand you need me out of your life in order to feel at peace.' . . . 'Being ostracized is much better for everyone tha[n] what happened last time I visited[.]'" (Ellipses in original.)

{¶ 43} P.M. acknowledged that K.H. did not respond to any of his attempts to contact her, which he took as "a signal she didn't want to talk to him[.]" However, he wants a relationship with his daughter and thinks a relationship with K.H. is necessary to facilitate that. He thought that K.H. filed the petition to alienate him from the baby and deny him visitation.

{¶ 44} P.M. never threatened K.H. with a gun or used a gun in any of the incidents that K.H. presented to the court.

{¶ 45} The magistrate believed that P.M.'s testimony was

pretty straight forward; but at times evasive. [He] wanted to expound to get his points across. His testimony and position certainly didn't jive with the tenor of his June 16, 2023 letter. Instead of any understanding of [K.H.'s] need to feel safe; [his] posture and testimony was [sic] more forceful and aggressive insisting/disturbing [K.H.'s] life. At one point, [P.M.] testified the parties have to communicate as they have a child together. In Court, there was no sensitivity to [K.H.'s] feeling 'unsafe' or vulnerable. Rather, his conduct and actions were more "forcing" the matter[.]

In contrast, the magistrate said that K.H. was

a bit awkward responding to questions. There were long pauses between questions and answers, even on basic questions. It appeared [K.H.] either had difficulty processing information or has had someone else handle difficult, stressful situations for her in the past. Perhaps that is the dynamic which led to their relationship. At some point, [her] testimony didn't follow. The best example is when she testified about how she felt about

16.

[P.M.] possibly having her firearm she was "horrified." Yet, when asked whether she was asking this Court to curtail [P.M.'s] rights to a firearm, her response, after a very, very long pause, was "No[.]"

Regardless, the magistrate found K.H.'s testimony "largely credible[.]"

**{¶ 46}** K.H. testified that she moved to Sandusky shortly after the parties' daughter was born to live with her parents because she needed her parents' assistance. In September 2022, she moved into her own house in Sandusky. While she was in Sandusky, she had near-daily text communications with P.M., and he came to visit them in the months after the baby's birth.

**{¶ 47}** K.H. said that P.M. "had a personality change" after the baby was born, but gave only "very vague descriptions, without examples[.]" K.H. claimed that P.M. was "mentally abusive, spoke out of both sides of his mouth, confusing, 'didn't want to be in a relationship' and called her a 'whore[,]'" which "left her 'devastated', 'confused'', 'hurt' and 'traumatized.'"

**{¶ 48}** In September 2022, P.M. came for a scheduled visit with the baby. He seemed normal when he got there. K.H. wanted "clarity" about their relationship, but the discussion went "'south,'" P.M. became agitated, called her a whore, and used an "'aggressive' . . . physical stance, demeanor and words." The situation left K.H. confused. P.M. stayed the first time K.H. asked him to leave, but left the second time. K.H. thought that the hole P.M. punched in the wall of her house "'was for her' and was a message." She could not remember if she moved out of the way at the time P.M. was throwing the punch but moved away from him afterward. P.M. followed her and yelled at her. She locked the door and windows after P.M. left. This incident left her terrified

17.

and in shock, and she was "still 'terrified' today." She did not call the police on P.M., then or any other time, and "after leading by counsel, stated she was unfamiliar with the process."

{¶ 49} In October 2022, K.H. was doing laundry on the second level of her house when she heard a loud knock. She looked into the bedroom and saw P.M. standing there. She did not give him permission to come into her house and had not seen the text messages he sent minutes before coming over. P.M. was upset and wanted his things, but he left. K.H. testified that she told a friend what happened, but did not identify the friend or call them as a witness. P.M. sent a text message telling K.H. that he was going to get something to eat. Later, he came back to K.H.'s front door. She answered the door, and he asked to speak with her. K.H. did not answer when she was asked if she invited P.M. in. P.M. sat down to tell her about his life, but the conversation got heated, and K.H. asked him to leave. She did not report the incident to the police because "'[i]n her mind, she was trying to figure out what was going on.'" After this incident, she went to stay with her parents for at least a month and replaced the doors and windows, "which hadn't been working right, . . ." and installed a security camera because she did not feel safe at her home.

{¶ 50} Regarding P.M.'s texts from December 2022, K.H. found them harassing or a form of intimidation because she thought that P.M. was "signaling he could come and go as he pleased, while she didn't feel safe." Knowing that P.M. was looking at her from the road while she thought she was in the privacy of her own home made her feel

shocked, violated, scared, unsafe, and like she did not want to be in the house anymore. K.H. did not respond to any of P.M.'s text messages from this point on.

{¶ 51} In April 2023, P.M. came by K.H.'s house while driving his stepmother's truck. She heard a knock on her door, but did not answer. Later, she found a bag of food on the porch. She did not give P.M. permission to come to the house and had not responded to any of his messages for the past four months.

{¶ 52} K.H. claimed that she was "not savvy about what legal options she had[,]" but was generally aware of the existence of restraining orders. She started actively researching them following the April 2023 incident and she filed her petition "'within a week.'"

{¶ 53} Regarding the magistrate's decision to restrict P.M.'s access to firearms, the magistrate first found that K.H.'s testimony about her gun was "odd." K.H. "inferred from some vague reference to whether she wanted anything from the Bowling Green storage unit and [P.M.] giving her a large hunting knife for her protection, that [P.M.] has possession of her firearm." The magistrate also acknowledged that K.H.'s other testimony about P.M. possibly having her gun was inadmissible because it resulted from settlement discussions. Additionally, "compounding this oddity was the inherent inconsistency between [K.H.] being 'horrified' [P.M.] had a firearm and her testimony she didn't want the court to curtail his gun rights[.]"

19.

{¶ 54} The magistrate also noted that K.H. said, "[a]fter yet another very long pause, . . ." that she had not seen P.M.'s drug or alcohol use have any adverse impact on him.

{¶ 55} K.H. has never told P.M. not to contact her. She was "'surprised'" that he wanted a relationship with the baby. P.M. had not seen the baby in six to nine months because K.H. thought his actions were "threatening/violent."

{¶ 56} In his conclusions of law, the magistrate found that "[a]lthough this is a very close case[,]" K.H. had proven by a preponderance of the evidence that she was entitled to a CPO under R.C. 3113.31. She and P.M. were in a dating relationship that produced a child. P.M.'s pattern of unwanted conduct began in September 2022, when he became agitated after a long conversation with K.H. and punched a hole in the wall of her house. K.H. was "reasonably fearful as a result." Less than a month later, P.M. entered her bedroom uninvited. He also sent her text messages, including one telling her that he could see her from the road, and left unwanted gifts for her. Finally, after K.H. filed her petition, he sent her a letter telling her that they were "soul bound," he understood that she needed him out of her life to feel at peace, and him being "ostracized" was better than "what happened the last time [he] visited."

{¶ 57} However, contrary to the feelings that he expressed in his letter, P.M.'s attitude during the hearing was "anything but laying off." Instead, the magistrate interpreted P.M. as "forcing the matter" because he thought that he and K.H. needed to

20.

have a relationship since they have a child together and he "continues to disrupt [K.H.'s] 'peace' by breaking into her home; spying on the house; [and] leaving unwanted gifts."

{¶ 58} Regarding K.H.'s mental distress, the magistrate found that her testimony that she did not feel safe, stayed with her parents for a month after the October 2022 incident, had her doors and windows repaired, and installed a security camera indicated a change in her routine that corroborated mental distress. She also said that she felt shocked, violated, scared, and not safe because of P.M.'s actions.

{¶ 59} K.H.'s inaction—her failure to call the police or clearly tell P.M. not to contact her—is what made this a close case. But the magistrate found that P.M. "should've gotten the message [that] his contact was unwanted" from K.H.'s complete lack of response. The magistrate also discounted P.M.'s theory that K.H. filed the petition to prevent him from having contact with the baby. Although the magistrate expressed "some empathy" because P.M. had not seen his daughter for months, "forcing himself into [K.H.'s] life is not the way to do it especially when [P.M.] knows for a fact (and wrote) she's not 'at peace' with him in her life[.]" While admitting that there are "obvious factual differences" between this case and the cases he cited, the magistrate found that "case law does acknowledge CPO's [sic] are proper when a former or 'hopeful' romantic partner who 'just don't [sic] get it' causes mental distress."

### D. P.M.'s objections

{¶ 60} P.M., who was represented by an attorney at the full hearing, filed pro se objections to the magistrate's decision. In them, he argued that the evidence was

21.

insufficient to support the CPO for two reasons. First, because he believed that he had "a legal responsibility to provide support and care to his Minor Child, . . ." his continued efforts to communicate with K.H. were "a reasonable effort at mediation in pursuit of a custody agreement[,]" and, under the circumstances, he could not have known that his actions were causing K.H. mental distress. Specifically, he pointed out that K.H. never communicated to him that he could not come into her house, send electronic or postal communications, or offer gifts, and that his last interactions with K.H. in October 2022 were friendly. Second, he argued that K.H.'s testimony did not show that moving in with her parents while her house was being remodeled and she had a newborn was a change in her routine due to mental distress. Next, he complained that "[m]any conclusions in the Ruling are based on [K.H.'s] testimony alone" and that he was "obstructed" by his lawyer from presenting evidence and giving his "narrative" on the witness stand. Finally, he objected to the firearms restrictions in the CPO because K.H. did not ask for them, he had no prior arrests or complaints against him, he needed to use firearms as part of his livestock-farming operation, and he "question[ed] the sincerity of [K.H.'s] claims." In addition to objections specific to the magistrate's decision, P.M. included factual information that was not presented at the hearing and addressed issues with the parties' custody case in the juvenile court.

{¶ 61} K.H. did not file objections to the magistrate's decision or a response to P.M.'s objections.

22.

## E. Trial court's decision

{¶ 62} The trial court overruled P.M.'s objections and affirmed the CPO in its entirety. It found that the CPO was properly supported by evidence of mental distress and that P.M.'s arguments provided justifications for his behavior rather than demonstrated the absence of a pattern of conduct.

{¶ 63} The court also found that, "[w]ith all being required is a Preponderance of the evidence, . . ." the CPO was supported by the weight of the evidence because K.H. testified that P.M. was mentally abusive to her; he made her feel devastated, hurt, confused, traumatized, terrified, shocked, violated, and unsafe; she continued to feel terrified "to this day[;]" she stayed with her parents for a month because she did not feel safe in her own home; and she got a security camera. On top of that, P.M. admitted that he took K.H.'s lack of communication as a sign that she did not want to talk to him; entered K.H.'s house through an unlocked back door, even though she had never explicitly given him permission to come into the house; punched a hole in her wall; and sent her a letter after she filed the CPO petition.

{¶ 64} The court went on to reject P.M.'s argument regarding the magistrate's assessment of the parties' credibility. Part of the trial court's credibility assessment relied on the factual information from outside the record that P.M. included in his objections. But the court also determined that P.M. should have known that his actions did or would cause K.H. mental distress based on some of the statements he made in his June 2023 letter, including, "I understand you need me out of your life in order to feel peace[,]" and

23.

"[b]eing ostracized is much better for everyone than what happened last time I visited." The court also discounted P.M.'s credibility based on his evasive answer about why he was in Sandusky the day he left the mug in K.H.'s mailbox.

{¶ 65} The trial court did not address P.M.'s objection to the deadly-weapons restrictions.

{¶ 66} P.M. now appeals, raising two assignments of error:

> FIRST ASSIGNMENT OF ERROR: THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION AS THE GRANTING OF A CIVIL PROTECTION ORDER WAS NOT SUPPORTED BY THE MANIFEST WEIGHT OF THE EVIDENCE[.]

> SECOND ASSIGNMENT OF ERROR: THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN ORDERING THAT RESPONDENT NOT POSSESS USE CARRY OR OBTAIN ANY DEADLY WEAPON AND BY ORDERING THAT RESPONDENT TO [sic] TURN OVER ALL DEADLY WEAPONS AS SUCH WAS NOT REQUESTED BY THE PETITIONER AND HAD NO NEXUS TO THE ALLEGED CONDUCT.

## II. Law and Analysis

{¶ 67} In his assignments of error, P.M. argues that the trial court erred by issuing the CPO because the record does not show that he *knowingly* caused K.H. mental distress, and by including the deadly-weapons restrictions because K.H. did not ask for

them and they have no causal nexus to the events underlying the CPO. We address each argument in turn.

## A. Standard of review

{¶ 68} Dating violence civil protection orders against former romantic partners are authorized by R.C. 3113.31. *See* R.C. 3113.31(A)(8)-(9) (defining "dating relationship" and "person with whom the respondent is or was in a dating relationship"). Under the statute, the petitioner must allege that she and the respondent are or were in a dating relationship and that the respondent engaged in an act of domestic violence against her. R.C. 3113.31(C)(1)-(3). As relevant here, an act of domestic violence includes a violation of R.C. 2903.211, the menacing-by-stalking statute. R.C. 3113.31(A)(1)(a)(ii).

{¶ 69} To obtain a CPO based on menacing by stalking, the petitioner is required to show by a preponderance of the evidence that the respondent engaged in a pattern of conduct by which he knowingly (1) caused the petitioner mental distress, (2) caused the petitioner to believe that he would cause her physical harm, or (3) caused the petitioner to believe that he would cause her mental distress. R.C. 2903.211(A)(1). A person acts knowingly when, regardless of his purpose, he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. R.C. 2901.22(B).

{¶ 70} "Mental distress" includes any "mental illness or condition" that either "involves some temporary substantial incapacity[,]" or "would normally require psychiatric treatment, psychological treatment, or other mental health services . . . ." R.C. 2903.211(D)(2)(a)-(b). In the context of menacing by stalking, "'[i]ncapacity is

substantial if it has a significant impact upon the victim's daily life.'" *Ellet v. Falk*, 2010-Ohio-6219, ¶ 38 (6th Dist.), quoting *State v. Horsley*, 2006-Ohio-1208, ¶ 48 (10th Dist.). Substantial incapacity can be corroborated by a change in the petitioner's routine. *Spaulding v. Spaulding*, 2021-Ohio-533, ¶ 13 (6th Dist.). But mental distress is something more than "'mere mental stress or annoyance[.]'" *Fondessy v. Simon*, 2013-Ohio-3465, ¶ 19 (6th Dist.), quoting *Caban v. Ransome,* 2009-Ohio-1034, ¶ 29 (7th Dist.). The petitioner's testimony, alone, is sufficient to establish mental distress. *Ensley v. Glover*, 2012-Ohio-4487, ¶ 13 (6th Dist), citing *Horsley* at ¶ 48.

{¶ 71} In *Felton v. Felton*, 79 Ohio St.3d 34 (1997), the Supreme Court decided that preponderance of the evidence is the appropriate standard of proof in a CPO case. The court did not determine how appellate courts are to review a trial court's CPO decision on appeal, however, which has led to different approaches in different districts (and, sometimes, different approaches within the same district). *See Denney v. Sanders*, 2016-Ohio-5113, ¶ 15 (1st Dist.) (citing cases); *Abuhamda-Sliman v. Sliman*, 2005-Ohio-2836, ¶ 8-9 (8th Dist.) (citing cases). The districts' approaches fall into three general categories: some courts use an abuse-of-discretion standard, some use a manifest-weight-of-the-evidence standard, and some choose a standard of review based upon the type of challenge the appellant raises on appeal. *See id.*; *see also, e.g., Hamon v. Weeks*, 2021-Ohio-1770, ¶ 7 (3d Dist.) (abuse of discretion); *Hammond v. Sait*, 2023-Ohio-893, ¶ 37 (7th Dist.) (appeal dependent).

{¶ 72} For our part, we have not always been careful or consistent with our

26.

standard of review in CPO cases.  In *Gruber v. Hart*, 2007-Ohio-873, ¶ 17 (6th Dist.), a stalking CPO case under R.C. 2903.214, we adopted the case-specific approach, holding that a challenge to the trial court's decision to issue or deny a CPO is reviewed under a manifest-weight-of-the-evidence standard, and a challenge to the scope or terms of the CPO is reviewed under an abuse-of-discretion standard.  We recently reiterated that these are the correct standards of review for stalking CPO cases.  *P.A. v. Rorick*, 2023-Ohio-4578, ¶ 21 (6th Dist.).  Dating and domestic violence CPOs under R.C. 3113.31 and stalking CPOs under R.C. 2903.214 are "substantially similar," *Denney* at ¶ 17, and the fact that a case involves one statute instead of the other "'does not alter the analysis or result.'" *Keene v. Duke*, 2022-Ohio-2321, ¶ 14 (5th Dist.), quoting *Toombs v. McGuire*, 2021-Ohio-387, ¶ 8 (5th Dist.).  Despite that, we generally have not followed this case-specific approach in R.C. 3113.31 appeals; instead, we usually review a DVCPO only for abuse of discretion.  *See, e.g., Spaulding* at ¶ 10, citing *Olson v. Olson*, 2016-Ohio-149, ¶ 12 (6th Dist.) (reviewing issuance of DVCPO for abuse of discretion); *A.B. v. I.E.*, 2024-Ohio-1809, ¶ 24 (6th Dist.) (same); *but see Smith v. Strong*, 2017-Ohio-6918, ¶ 16 (6th Dist.) (reviewing issuance of DVCPO under manifest-weight standard); *Adamski v. Adamski*, 2022-Ohio-32, ¶ 58 (6th Dist.) (reviewing scope of DVCPO for abuse of discretion).[2]

---

[2] In *Kovacs v. Kovacs*, 2004-Ohio-2777 (6th Dist.), a case that we reversed without addressing the merits because the trial court did not properly review the magistrate's decision, in response to the standard of review in the appellant's brief, we articulated the correct standard in a footnote.  *Id.* at ¶ 4, fn. 1.  We said, "[a]n appellate court reviews the

27.

{¶ 73} But, although some of our precedent states that we review DVCPO decisions for an abuse of discretion, many of these same cases have not actually applied the abuse-of-discretion standard. Instead, we almost always pull the manifest-weight standard into the abuse-of-discretion review, saying that "[i]f the trial court's decision is supported by *credible and competent evidence*,"—i.e., it is not against the manifest weight of the evidence—"the appellate court will not reverse the decision as an abuse of discretion." (Emphasis added.) *Rangel v. Woodbury*, 2009-Ohio-4407, ¶ 11 (6th Dist.), citing *Jarvis v. Jarvis*, 2004-Ohio-1386, ¶ 13 (7th Dist.); *Johnson v. Komisarek*, 2017-Ohio-2580, ¶ 9 (6th Dist.); *Spaulding* at ¶ 10; *A.B.* at ¶ 24. This only further muddies our CPO jurisprudence.

{¶ 74} After reviewing the case law, we find that the case-specific approach is the correct one for CPOs under R.C. 3113.31. To be entitled to a protection order under R.C. 3113.31, a petitioner must show by a preponderance of the evidence that the respondent has committed domestic violence, as defined in R.C. 3113.31(A)(1), against a person with whom he has or had a family, household, or dating relationship, as defined in R.C. 3113.31(A)(3), (8), or (9). *Felton*, paragraph two of the syllabus, citing R.C. 3113.31(D).

---

granting of a civil protection order under the competent, credible evidence standard. . . . Thus, a trial court's judgment regarding the grant or denial of a protective order, will not be reversed if it is 'supported by some competent, credible evidence going to all the essential elements of the case[.]'" *Id.*, quoting *C.E. Morris Co.* at syllabus. Curiously, we did not use this standard again in a DVCPO case for many years, instead relying on *Deacon v. Landers*, 68 Ohio App.3d 26, 31 (4th Dist. 1990), which is no longer good law in the Fourth District, and the dissent in *Parrish v. Parrish*, 95 Ohio St.3d 1201, 1204 (2002) (Lundberg Stratton, J., dissenting), which cites *Deacon*, to support the abuse-of-discretion standard.

{¶ 75} When it reviewed the CPO at issue in *Felton*, the Supreme Court opined (without mentioning the trial court's discretion) that the record contained "sufficient, credible evidence" to show that the petitioner was in danger of domestic violence and the respondent committed acts of domestic violence. *Id.* at 43-44. From that, it is "reasonable to infer" that the question we must answer when an appellant challenges the trial court's decision to *issue* a CPO is *not* whether the trial court abused its discretion by issuing the CPO, but "whether the there was sufficient credible evidence to support a finding that the respondent had engaged in acts or threats of domestic violence." *Abuhamda-Sliman*, 2005-Ohio-2836, at ¶ 10 (8th Dist.). We came to this conclusion regarding stalking CPOs years ago in *Gruber*, 2007-Ohio-873, at ¶ 17 (6th Dist.). And because CPOs under R.C. 3113.31 and R.C. 2903.214 are "substantially similar," *Denney*, 2016-Ohio-5113, at ¶ 17 (1st Dist.), the standards that we adopted in *Gruber* should logically also apply to dating and domestic violence CPOs.

{¶ 76} Further, a number of our CPO cases—including several of our most frequently cited cases—cite *Deacon*, a Fourth District decision, for the proposition that "[t]he decision to grant or dismiss a request for a civil protection order is within the discretion of the trial court." *Rangel* at ¶ 11, citing *id.* at 31; *see also Olson* at ¶ 12; *Spaulding*, 2021-Ohio-533, at ¶ 10 (6th Dist.). The Fourth District, however, subsequently rejected *Deacon*. In *Gooderham v. Patterson*, 1999 WL 1034472, *2 (4th Dist. Nov. 9, 1999), the Fourth District took the "opportunity to clarify [its] standard of reviewing a trial court's decision regarding a domestic violence CPO issued under R.C.

29.

3113.31[,]" and found that the manifest-weight standard that it had been using since deciding *Deacon* "illustrate[d] the appropriate standard" of review, "particularly in light of the Supreme Court's decision in *Felton* . . . ." In other words, *Deacon*—which the vast majority of our CPO cases eventually trace back to—is no longer good law, and we cannot continue relying on it to support abuse-of-discretion review of the issuance of a CPO.

{¶ 77} The same is true of *Jarvis*, a Seventh District decision, which is another case that the vast majority of our CPO cases eventually trace back to. Just two years after it decided *Jarvis*, the Seventh District decided *Williams v. Hupp*, 2011-Ohio-3403, ¶ 18-21 (7th Dist.), in which it joined the Second, Fourth, Eighth, and Tenth Districts by holding that "the better course is to apply a manifest weight standard of review when the issue is whether a civil protection order should issue, and an abuse of discretion standard of review when the issue is the scope of the civil protection order." *Id.* at ¶ 21. Thus, *Jarvis* is no longer good law, and we cannot continue relying on it, either.

{¶ 78} Therefore, going forward, when the appellant challenges the trial court's decision to issue or deny a CPO under R.C. 3113.31 (rather than challenging the scope or terms of the CPO), we will review the decision under a manifest-weight-of-the-evidence standard. In a manifest-weight review, we weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the trial court clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the trial court's judgment must be reversed. *Eastley v.*

*Volkman*, 2012-Ohio-2179, ¶ 20. We will not reverse the trial court's decision if it is supported by some competent, credible evidence going to all the essential elements of the case. *Edwards v. Reser*, 2007-Ohio-6520, ¶ 25 (6th Dist.), citing *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279 (1978), syllabus.

{¶ 79} Regarding the scope and terms of a CPO, "[b]ecause R.C. 3113.31 expressly authorizes the courts to craft protection orders that are tailored to the particular circumstances, it follows that the trial court has discretion in establishing the scope of a protection order . . . ." *Abuhamda-Sliman* at ¶ 9; *Denney* at ¶ 18; *see* R.C. 3113.13(E)(1)-(2), (6). Therefore, we will continue to review the trial court's decision on the scope and terms of a CPO issued under R.C. 3113.31 for abuse of discretion. *Adamski*, 2022-Ohio-32, at ¶ 58 (6th Dist.) ("When the challenge to the [R.C. 3113.31] CPO involves the scope of the order . . . we review the order for an abuse of discretion."). Abuse of discretion means that the trial court's decision was unreasonable, arbitrary, or unconscionable. *State ex rel. Askew v. Goldhart*, 75 Ohio St.3d 608, 610 (1996).

## B. The trial court's decision to issue the CPO is supported by the weight of the evidence.

{¶ 80} Turning to P.M.'s assigned errors, in his first assignment of error, he argues that the trial court should have dismissed K.H.'s petition because she failed to show by a preponderance of the evidence that he knowingly caused her mental distress. He contends that it is not reasonable to infer that leaving a coffee mug in her mailbox and a bag of food on her porch "would cause mental distress or be received in a negative manner[,]" particularly when their last in-person interaction in October 2022 was friendly

and K.H. did not tell him that his presence and communications were unwanted.

{¶ 81} In a manifest-weight review, we presume that the factfinder's factual determinations are correct because the factfinder "is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. City of Cleveland*, 10 Ohio St.3d 77, 80 (1984). We generally defer to the factfinder on issues of credibility. *Tillimon v. Hollstein*, 2024-Ohio-3346, ¶ 76 (6th Dist.), citing *Suburban Realty L.P. v. MD Vape & Tobacco, LLC*¸ 2023-Ohio-3198, ¶ 38 (12th Dist.). And "[m]ere disagreement over the credibility of witnesses or evidence is not sufficient reason to reverse a judgment." *Sotnyk v. Guillenno*, 2014-Ohio-3514, ¶ 4 (6th Dist.), citing *Seasons Coal* at 81.

{¶ 82} P.M.'s arguments essentially come down to him disagreeing with the magistrate's credibility determinations. The version of the facts that he uses to support this assignment of error accepts his testimony at the hearing as true, ignores K.H.'s contradictory testimony, glosses over some of the most negative events (e.g., letting himself into her home and texting her about watching her and the baby from the street), and ignores his knowledge of K.H.'s mental distress evident in his June 2023 letter. Although this is one way to interpret the evidence presented at the hearing, it is not the only way to interpret the evidence. The magistrate, who saw P.M. and K.H. testify in person and specifically detailed the reasoning behind his credibility determinations, found K.H. more credible and her version of events more believable. P.M. has not

pointed to anything in the record that convinces us that we should override the trial court's acceptance of the magistrate's credibility determinations.

{¶ 83} Additionally, the trial court's decision is supported by some competent, credible evidence that P.M. acted knowingly. After he and K.H. got into a fight and he punched a hole in her wall, she asked him to leave her house and did not respond to any of his communication attempts for two weeks. Despite that, he returned to her house and went inside through an unlocked back door that opened into her bedroom without explicit permission or any response to his texts about coming over. He left but came back soon after and went back into the house when K.H. opened the front door. K.H. again asked him to leave when they began arguing. This was the last time they were together in person. For the next two months, K.H. did not respond to any of P.M.'s communication attempts. Although she continued to ignore him, P.M. chose to leave a gift in her mailbox. When he did so, he sent her a text message telling her that he had been outside on the street and had seen her and their daughter while they were inside their house. After four more months of K.H. ignoring all communications from him (including at least one message offering to give her food from his farm), he left a bag of food from his farm on her porch. About six weeks later, *after* K.H. filed her CPO petition indicating that he was causing her mental distress, P.M. sent her a letter acknowledging that he *knew* that she was having trust issues and did not feel at peace and that the only way she could feel safe and peaceful was having him out of her life. Considered as a whole, these incidents show that P.M. was aware that his behavior caused or probably caused K.H. mental

33.

distress—i.e., that P.M. acted knowingly.

{¶ 84} Because we defer to the trial court's credibility findings and find that the trial court's decision is supported by some competent, credible evidence, the trial court's decision to issue the CPO is not against the manifest weight of the evidence. Therefore, P.M.'s first assignment of error is not well-taken.

### C. The trial court abused its discretion by including the deadly-weapons restrictions.

{¶ 85} In his second assignment of error, P.M. argues that the trial court abused its discretion by including the deadly-weapons restrictions in the CPO because K.H. did not request them and they have no causal nexus to the incidents underlying the petition.

{¶ 86} Restricting a respondent's access to deadly weapons is not required when a trial court grants a DVCPO. *See* R.C. 3113.31(E)(1). However, R.C. 3113.31(E)(1)(h) allows the trial court to "[g]rant other relief that the court considers equitable and fair, . . ." which can include any deadly-weapons restrictions. This gives the trial court "broad discretion when imposing restrictions pursuant to a civil protection order." *Thom v. Mulvin*, 2009-Ohio-3797, ¶ 12 (6th Dist.), citing *Maag v. Maag*, 2002 WL 468585 (3d Dist. Mar. 28, 2002). But the statute does not give the court unlimited discretion. Any restrictions the trial court imposes must have a "sufficient nexus" to the conduct that the court is attempting to prevent. *Id.*; *see also Ehlers v. Thomas*, 2024-Ohio-2531, ¶ 26 (12th Dist.); *F.-S. v. Pacek*, 2015-Ohio-4310, ¶ 16 (9th Dist.); *Sistek v. Gredence*, 2006-Ohio-4169, ¶ 36 (11th Dist.). In the context of weapons restrictions, this generally requires some evidence that the respondent used or threatened to use a deadly weapon to

34.

harm the petitioner. *See Ehlers* at ¶ 26, quoting *Doran v. Doran*, 2009-Ohio-5521, ¶ 34 (12th Dist.) ("[O]ur sister courts found weapons restrictions in a CSPO to be inappropriate 'where no evidence is presented that the respondent used or threatened to use a deadly weapon to harm the petitioner.'"); *but see Thom* at ¶ 13 (upholding weapons restrictions where respondent acted "unnecessarily violent and combative" toward animals and people who were not petitioner and had "several guns, one of which he keeps in his vehicle 'to scare people.'").

{¶ 87} In this case, the trial court abused its discretion because there is not a sufficient nexus between P.M.'s conduct and the weapons restrictions. Although there was testimony that P.M. owns a gun and had K.H.'s gun at one point, there is absolutely no evidence that a gun or any other deadly weapon was involved in any of the incidents that K.H. testified to, or that P.M. engaged in or threatened any physical violence toward K.H. (or anyone or anything else) after punching the wall in September 2022. The magistrate's assessment of K.H.'s testimony about P.M. and the guns as "odd" and "inconsistent" is not enough to create a nexus between P.M.'s behavior that caused her mental distress—i.e., sending her unreciprocated communications, coming to her home uninvited, and leaving her unwanted gifts—and his use or possession of deadly weapons. Therefore, the trial court abused its discretion by overruling P.M.'s objection to the weapons restrictions, and P.M.'s second assignment of error is well-taken.

35.

### III. Conclusion

{¶ 88} Because the trial court's decision is supported by some competent, credible evidence, we affirm the court's decision to issue the CPO.  However, because the trial court abused its discretion by including the deadly-weapons restrictions, we modify the CPO to remove the terms related to deadly weapons.  Therefore, the November 15, 2023 judgment of the Erie County Court of Common Pleas is modified to delete provisions 8, 9, and 10, but is affirmed in all other respects.  The parties are ordered to divide the costs of this appeal equally under App.R. 24.

Judgment affirmed<br>and modified, in part.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Thomas J. Osowik, J.                  _____
                                                     JUDGE

Christine E. Mayle, J.

Charles E. Sulek, P.J.                _____
CONCUR.                                                JUDGE

                                            _____
                                                     JUDGE

> This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.